T.C. Memo. 2010-69

UNITED STATES TAX COURT

KRISTINE J. WOLFGRAM, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 27688-07, 28919-07.    Filed April 7, 2010.

Kristine J. Wolfgram, pro se.

<u>Christian A. Speck</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, <u>Judge</u>:  On September 4 and 21, 2007, the
respondent IRS mailed petitioner Kristine J. Wolfgram (Wolfgram)
separate notices of deficiency for the taxable years 2005 and
2004, respectively.  In those notices the IRS determined the
following deficiencies, additions to tax for late filing,

additions to tax for late payment, and additions to tax for failure to pay estimated income tax:[1]

|  | | Additions to Tax | | |
| | | Sec. | Sec. | Sec. |
| Year | Deficiency | 6651(a)(1) | 6651(a)(2) | 6654 |
| 2004 | $145,658 | $32,773.05 | $20,392.12 | $4,228.00 |
| 2005 | 6,771 | 1,523.48 | 541.68 | 271.61 |

The issues for decision are: (1) Whether Wolfgram is entitled to business-expense deductions she claimed for 2004 and 2005 allegedly related to a house that was designed to be a bed-and-breakfast inn, (2) whether she is entitled to dependency exemptions and various educational credits, (3) whether she is liable for the section 6651(a)(1) late-filing addition to tax for 2004 and 2005, and (4) whether she is liable for the section 6654 failure-to-pay-estimated-tax addition to tax for 2005.[2]

## FINDINGS OF FACT

We adopt as findings of fact all statements contained in the stipulations of facts. The stipulations of facts and the attached exhibits are incorporated here by this reference. At the time she filed her petitions, Wolfgram resided in California.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]As discussed below, the IRS has conceded that Wolfgram is not liable for the sec. 6651(a)(2) late-payment addition to tax for 2004 and 2005 and the sec. 6654 failure-to-pay-estimated-tax addition to tax for 2004.

Therefore, an appeal of our decision in these cases would go to the Court of Appeals for the Ninth Circuit, unless the parties both stipulate the jurisdiction of the Court of Appeals for another circuit. See sec. 7482(b)(2).

In 2004 Wolfgram and her husband (the Wolfgrams) decided to pursue their dream of building a bed-and-breakfast inn. At some point in the year the Wolfgrams sold their old house for $422,000 and used the money to buy a picturesque piece of land in Michigan Bluff, California. They rented a mobile home to serve as both their office and living quarters, placing the mobile home on the Michigan Bluff site. They completed construction of the new house in 2007 and now live in it. As we recount later in this opinion, after the petitions in these cases were filed the Wolfgrams jointly submitted late tax returns for tax years 2004 and 2005 in which they claimed business expense deductions related to the construction of the new house.

During 2004 and 2005 Wolfgram commuted daily from the mobile home in Michigan Bluff to her day job in Rancho Cordova, California, where she worked for an entity called Alpha Fund Joint Powers Agency. It is unclear how much time she spent building the new house. Most of the work related to the house was done by Wolfgram's husband.

It is also unclear whether the Wolfgrams had originally intended to sell the house or to operate it as a bed-and-breakfast inn. On cross-examination, Wolfgram equivocated:

> Q    Could you explain to me exactly what is the business that's represented on these Schedule Cs?
> A    It is the construction of the bed-and-breakfast.
> Q    How did you intend to make a profit from constructing the bed-and-breakfast?
> A    By buying various pieces of property and building them for commercial use.
> Q    Buying pieces of property would cost you money; when did you expect to receive income or any kind of money with respect to these bed-and-breakfasts?
> A    You know, I would like to--you to speak with my husband and have him comment on that.
> Q    Would you agree that you were not in the business of selling bed-and-breakfast facilities?
> A    In that particular facility, in that home, in that--
> Q    Yes, that particular facility?
> A    Would I agree?
> Q    Yes.
> A    No, I would not agree.
> Q    How then were you intending to make money from that particular facility?
> A    By eventually renting it out to bed-and-breakfast customers.
> Q    Were the expenses that are represented on the Schedule Cs, were they costs incurred in building the facility?
> A    Probably costs incurred in developing the land.
> Q    Building the building?
> A    You know, I'd really like you to talk with my husband regarding this.
> Q    So your answer is you're not sure what these expenses were?
> A    That's true. It would be up to interpretation.

Wolfgram's husband initially asserted that the purpose of the enterprise was "not running the bed-and-breakfast, it [was]

developing the real estate for the bed-and-breakfast, that is, building it." But later in his testimony, he said that upon completing a new building, they "expected to go full steam into doing the bed-and-breakfast operation." He stated that the couple was planning on charging customers to stay at the establishment overnight. Wolfgram and her husband have never had any rent-paying customers at the new house.

Although the structure could be used as a single-occupancy family residence, as is evidenced by the fact that the Wolfgrams live alone in the house, Wolfgram's husband testified credibly that the layout and design of the structure were those of an inn, rather than those of a residence. All doorways were built 36 inches wide to make the premises wheelchair accessible. There was a separate unit with a kitchenette.

The Wolfgrams claimed deductions on their returns for "car and truck expenses" related to the house. The returns stated that these expenses related to only one vehicle. Wolfgram's husband initially testified that the expenses were related to Wolfgram's 104-mile round-trip commute in her car from the mobile home in Michigan Bluff to her job as a workman's compensation administrator in Rancho Cordova. But on cross-examination he said that some of the expenses were related to a truck he used "almost entirely for business in terms of running around to get licenses, * * * to get a lot of permits, visit the county whole

lot of times. [sic]"  We find that Wolfgram's husband owned a truck and used it in the construction of the new house.  We have no way of determining how much the truck was used in the construction of the new house as opposed to other uses.  We find that Wolfgram owned a car and used it to commute from the mobile home to her place of employment.  We are unable to estimate whether the mileage figures listed on the joint returns were allocable to the car versus the truck.

The Wolfgrams claimed deductions on their returns for "contract labor" expenses related to the house.  Wolfgram's husband testified credibly that the contract labor expense of $2,600 that the couple deducted for 2004 was a payment to an architect to design the new house.  He could not recall the name of the company but claimed to have an invoice for its services and the original design plans on his computer in his car near the courthouse.  Wolfgram's husband did not produce these items.  He did not explain the $2,500 contract labor expense claimed as a deduction in 2005.  We find that the Wolfgrams spent $2,600 in 2004 to pay an architect to design the new house.  We have no basis to find any other fact regarding the claimed expenses for contract labor.

The Wolfgrams claimed deductions for the rent expense related to the house.  Wolfgram's husband testified that the rent expense which the Wolfgrams claimed ($3,420 for each year) was

for "storage for things we brought up from the old house".  But at another point, he stated that the rent expense was in part (or entirely) allocable to the cost of renting the mobile home: "Well, the rent for the motor--there was a rent for the motor home that I forget the exact amount, but that's what is reflected here as a 3420 is the rent or leasing of the motor home."  We find that some of the $3,420 claimed on the return for each year corresponded to rent for the mobile home that the Wolfgrams lived in during construction.

The Wolfgrams claimed a deduction for $300 in "repairs and maintenance" expenses related to the house.  Wolfgram's husband testified that the $300 repairs-and-maintenance expense was for "wind damage to the motor home that winter."  We find that this is true.

The Wolfgrams deducted utility expenses related to the house.  The $600 utility expense deducted for 2004 was for "the price that the electric and power company charged for the temporary hookup in order to provide with water and with tool power necessary to do the building."  The $1,000 utility expense deducted for 2005 was for electricity used for:

> power tools, lights, heaters, things like that, especially the winter of 2005 where we had to heat an open house.  And we had a lot of ice forming that winter.  So I suspect that it is a compilation and it may be an estimate, a low estimate, of the electrical power bills that are going in there at that time.

The electric bills for the house and the mobile home were not separate. Wolfgram did not introduce any electric bills or any other documentary evidence. The testimony was imprecise and uncertain. Thus, we are unsure what services the 2004 and 2005 utility expenses were for (i.e., electric, gas, telephone, or water) and how much of each expense was allocable to the new house instead of the mobile home.

Wolfgram's husband testified that he forbade his wife to file a timely tax return:

> Q [by Wolfgram] Do you think I could have done the taxes myself?
>
> A [by Wolfgram's husband] I think it is no way and you couldn't have taken it to anybody to do them. The--I was absolutely prohibitive with respect to you doing that. Had threatened to take them to a tax specialist and I refused to let you. You had begged and pleaded with me at least 40 times, probably lot more, during those two years, to do them. I promised regularly that I would do them, I would do them. I just couldn't do them.

He stated that he threatened to leave his wife if she hired a tax-return preparer. Although he asserted that this was a "financial" threat, he did not describe how leaving his wife would hurt her financially. We find that Wolfgram's husband threatened to leave her if she filed her own timely tax return.

Wolfgram received the following payments in 2004:

- $52,265 of wages from her employer, Alpha Fund Joint Powers Agency
- $489 of interest "income", and

- An $812 refund of a prior year's State income tax payment, a payment that she had deducted on the prior year's Federal income-tax return.

And in 2005, Wolfgram received:

- $47,907 of wages from the same employer, Alpha Fund Joint Powers Agency, and

- $742 of interest "income".

The Wolfgrams did not file timely income tax returns for 2004 and 2005. The IRS received information returns showing that Wolfgram had received the unreported amounts listed above. It did not receive information returns showing that her husband earned any money. Not having received tax returns from either Wolfgram or her husband, the IRS sent to Wolfgram--and to her alone--a notice of deficiency dated September 21, 2007, for the 2004 tax year and a notice of deficiency dated September 4, 2007, for the 2005 tax year. The two notices were based on the above items of unreported income (and the capital gain from the sale of the Wolfgrams' home in 2004, which the IRS later conceded to be excludable from gross income, as discussed below). The notices determined additions to tax against Wolfgram for failing to file timely tax returns, failing to timely pay tax, and failing to pay estimated taxes. The IRS has conceded some of the additions to tax, as discussed below.

Wolfgram timely petitioned the Court on December 3, 2007, for the 2005 tax year (docket No. 27688-07) and December 14,

2007, for the 2004 tax year (docket No. 28919-07).[3]  Wolfgram's husband also signed both petitions, but on February 22, 2008, the Court dismissed him from both cases for lack of jurisdiction. Only after Wolfgram received the deficiency notices did Wolfgram and her husband file joint returns for 2004 and 2005.[4]  The 2004 return was received by the IRS on April 8, 2008; the 2005 return was received on some day in February 2008.  Both returns bore the date February 17, 2008.  In the returns, Wolfgram and her husband included all of the previously unreported items of income mentioned above.  Attached to each return was a Schedule C, Profit or Loss From Business, for a legal writing and research business operated by Wolfgram's husband.  For this business the schedules reported net business income of $336.25 for 2004 and $42.75 for 2005.  The IRS does not challenge the amounts on these schedules.  Also attached to each return was a Schedule C for "Developing Real Estate for Bed + Breakfast."  The schedules, which reported no income, listed the expenses as follows:

---

[3]At trial on Nov. 17, 2008, the IRS made an oral motion to consolidate the two cases, which the Court subsequently granted.

[4]Even though the Wolfgrams submitted their returns after the filing deadline, the claims of joint filing status on the returns entitle Wolfgram to joint filing status because the returns were made part of the record before these cases were submitted to this Court for decision.  See Phillips v. Commissioner, 86 T.C. 433, 441 n.7 (1986), affd. in part and revd. in part 851 F.2d 1492 (D.C. Cir. 1988).  Thus she qualifies for the tax rates applicable to "Married Individuals Filing Joint Returns".  See secs. 1(a)(1), 6013.

| Schedule C Expense Category | 2004 | 2005 |
|---|---|---|
| Car and Truck Expenses[1] | $6,131 | $11,764 |
| Contract Labor | 2,600 | 2,500 |
| Insurance | 600 | 600 |
| Interest: Other | 400 | -0- |
| Office Expenses | -0- | 200 |
| Rent or Lease: | | |
|    Vehicles, Machinery and Equipment | 3,420 | 3,420 |
|    Other Business Property | 880 | 1,320 |
| Repairs and Maintenance | 300 | -0- |
| Utilities | 600 | 1,000 |
|   Total | 14,931 | 20,804 |

[1]In pt. IV of Schedule C, entitled "Information on Your Vehicle", the Wolfgrams further detailed their claimed car and truck expenses.  Line 44 of Schedule C requests the following information:

> Of the total number of miles you drove your vehicle during  * * * [the taxable year], enter the number of miles you used your vehicle for:
>
> a Business......    b Commuting......   c Other......

For 2004 the Wolfgrams identified a vehicle as having been placed into service on May 1, 2004, and listed the miles driven as follows:  16,352 for "Business", the phrase "between jobs" for "Commuting" (even though the form requested a number), and 7,448 for "Other".  For 2005 they listed miles for the same vehicle as follows:  26,436 for "Business", zero for "Commuting", and 15,000 for "Other".  They answered "Yes" to the question "Was your vehicle available for personal use during off-duty hours?"  The Wolfgrams claimed on their returns that they had written evidence to support their car-and-truck expense claims but presented none to the IRS or to the Court.

The Wolfgrams also claimed exemptions for two sons as dependents on the 2004 return and an exemption for one son as a dependent on

the 2005 return.  They also claimed a $680 Lifetime Learning Credit for 2004 and a $828 Hope Scholarship Credit for 2005 with respect to one son.  Wolfgram provided no documentation substantiating any of these expenses, credits, or exemptions. Finally, the Wolfgrams reported a $1,200 payment for 2004 in the box on Form 1040, U.S. Individual Income Tax Return, used to report estimated taxes.  The Wolfgrams presented no evidence that this payment was ever made, nor has the IRS conceded that it was made.  As a result of their claims for deductions, credits, exemptions, and payments, their joint returns showed an overpayment of $64 for 2004 and no tax due for 2005.

A trial was held in San Francisco on November 17, 2008.

OPINION

I.  Arguments of the Parties

In her opening brief, Wolfgram asserts that her husband should not have been dismissed from the cases, claiming that he has constitutional standing and that the Federal Rules of Civil Procedure require that he be joined as a party to these cases.[5] Wolfgram says that the IRS's challenge to the Schedule C deductions is somehow procedurally defective:

---

[5]The reasoning contained in the order of Feb. 22, 2008, was sufficient to address Wolfgram's argument.  The order explained that we do not have jurisdiction over Wolfgram's husband because the IRS did not mail him a notice of deficiency.  The Tax Court cannot join a person in a case under its Rules or the Federal Rules of Civil Procedure if it has no jurisdiction over that person.  Guarino v. Commissioner, 67 T.C. 329, 332-333 (1976).

> While Respondent seeks to challenge individual matters on the Schedule C, Respondent waived such issues in preliminary proceedings by refusing to either allow the Schedule C's so that the parties could discuss individual items * * * or to state legal authority under relevant facts, why the Schedule Cs should not be allowed. Mr. Specks [sic] own statement of the issue implies that he still thinks that business losses should not be allowed to offset wage slave earnings; but he cites no authority for that position.

She argues that the "failure to timely file is obviously John's fault and not Kristine's" and that "all punishable conduct, if any, was by John who completely over reached or dominated Kristine into what ever position that she was in."

The IRS's answering brief begins with several concessions of determinations made in the notices of deficiency. It concedes that

- the amount of the capital gain received from the sale of the Wolfgrams' home in 2004 was excludable from income under section 121.

- Wolfgram should be permitted to elect joint filing status, and

- the estimated-tax penalty for the 2004 tax year and the failure-to-pay penalties for both the 2004 and 2005 tax years should not be imposed.

The IRS also states that because Wolfgram's husband was dismissed from this case as he was not a recipient of a notice of deficiency, it would not assert an increased deficiency for either tax year to reflect the net income attributable to his legal writing and research business reflected on the Schedule Cs for the business.

The IRS notes that Wolfgram stipulated that she received payments in the amounts stated supra pp. 8-9, including (1) wages for both years at issue, (2) interest for both tax years at issue, and (3) the 2004 State income tax refund. It contends that Wolfgram failed to prove that the Schedule C expenses she allegedly incurred were not personal expenses under section 262 and that she failed to provide any records to substantiate that she incurred the expenses. It notes in particular that Wolfgram failed to document her car and truck expenses as required under section 274(d). In addition, the IRS asserts that any expenses incurred in connection with a bed-and-breakfast activity were capital expenses under section 263(a)(1) or startup expenses under section 195(a) and thus are not currently deductible. The IRS argues that Wolfgram is not entitled to her claimed dependent exemptions for her children and Hope Scholarship and Lifetime Learning Credits for each year because she failed to provide evidence to support her entitlement to them.

The IRS maintains that it has met its burden of producing evidence that Wolfgram is liable for the late-filing penalty for both 2004 and 2005 and the estimated tax penalty for 2005. It denies that her husband's threat to leave her was a reasonable cause for her failure to file the tax returns on time. The IRS observes that Wolfgram was not "trapped" in her house, that she commuted over 100 miles to work every day, and that she paid her

other bills on time.  It claims that she could have driven to the post office to deposit a separate return in the mail.

In her reply brief, Wolfgram discusses the purpose of constructing the new house, but she equivocates.  She states that the house "was not intended to be a 'personal residence' but after completed, a business structure which the law requires that Petitioners also live in * * * An operating bed and breakfast." But later she states that "while it is true that Petitioner did not bring the bed and breakfast into operation in 2004 or 2005, that fact is irrelevant because the Schedule Cs did not purport to be generated or supported by that business but rather by the land development business."

She argues that it does not matter that she has no documents to substantiate her expenses because the IRS failed to adequately discuss the business expense deductions with her before trial. Furthermore, she claims that section 162 does not require that she demonstrate how much of the mobile home rent was allocable to a bed-and-breakfast business as opposed to the couple's personal expenses.  She suggests that the entire rental expense is deductible because it was necessary to live on site for the business venture to be successful.

Addressing the late-filing penalty, Wolfgram acknowledged that she

> was aware that a return was not filed and she would
> remind her legal counsel husband and he would promise

to file and tell her that there was not need to file it then because there was no tax due and no penalty for failure to file where no tax was due.  Over time she became more insistent and he responded more insistently including outright refusals to allow her to file returns and threatened to leave her which would cause serious financial loss.

Regarding the estimated-tax penalty, Wolfgram argues it is

not established * * * that out of the multiple bills she had to pay, that she reasonably knew that there was any bill due and owing to the IRS. * * * she reasonably knew that she didn't need a whole lot of write offs including automobile business mileage to 'zero her income tax obligation for those two years'.  That spending $100,000 on a business as against about $50,000 gross income should zero the income tax liability for that year is not unusual.

## II.  Deficiencies

Wolfgram must prove that the determinations of the deficiencies contained in the notices are wrong.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Wolfgram agreed in the stipulations of facts that she received the wages, interest, and State income-tax refund determined in both notices of deficiency.  She does not dispute that these payments are includable in her income.  See secs. 61(a)(1) (compensation for services), (4) (interest), 111 (refund of State taxes, the payment of which was deducted by the taxpayer in a prior year); Brobst v. Commissioner, T.C. Memo. 1988-456;  Tracy v. Commissioner, T.C. Memo. 1985-40.  Thus, we address her arguments that, in the tax years at issue, she is entitled to:  (1) The Schedule C deductions from her purported bed-and-breakfast

business, (2) Hope Scholarship and Lifetime Learning Credits, and (3) dependency exemptions.

A.    Deductions Claimed for the Cost of Constructing the House

As noted above, the Wolfgrams deducted expenses on their 2004 and 2005 Schedule Cs that they claim were related to the building of a bed-and-breakfast inn.  Because some of these expenses were indeed related to building a house that was designed, in part, to be operated as a bed-and-breakfast inn, a threshold issue is whether the Wolfgrams' involvement in building the house constitutes the carrying on of a business.  As we explain below in part II.A.1, we hold that it does not.  Then, in part II.A.2.a through i, we discuss each line item of the 2004 and 2005 Schedule Cs and explain additional reasons why Wolfgram is not entitled to her Schedule C deductions.

1.    The Bed-and-Breakfast Activity Did Not Constitute a Trade or Business

Section 162(a) provides that a taxpayer who is "carrying on" a "trade or business" may deduct ordinary and necessary expenses incurred in connection with the operation of the business.  The Supreme Court held in Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987), that to be considered to be carrying on a trade or business within the meaning of section 162, "the taxpayer must be involved in the activity with continuity and regularity and * * * the taxpayer's primary purpose for engaging in the activity must

be for income or profit." Thus, a threshold determination under Groetzinger is whether the taxpayer engaged in an activity with sufficient continuity and regularity that the activity constitutes a trade or business.

In considering whether the Wolfgrams' involvement with the alleged bed-and-breakfast inn was sufficiently continuous and regular, it does not matter whether the Wolfgrams intended to sell the house or operate it as a bed-and-breakfast inn. If they intended to operate it as a bed-and-breakfast inn, no such operation ever began because the Wolfgrams never had a customer. Nor is there any evidence of any sales efforts that could have led to customers. See Charlton v. Commissioner, 114 T.C. 333, 338 (2000) (expenses incurred before cabin rental activity became an active trade or business were not deductible); Goodwin v. Commissioner, 75 T.C. 424, 433 (1980) (expenses incurred before the commencement of business operations are not deductible under section 162(a)), affd. without published opinion 691 F.2d 490 (3d Cir. 1982); Frank v. Commissioner, 20 T.C. 511, 513 (1953) ("The petitioners were not engaged in any trade or business at the time the expenses were incurred. * * * [The expenses] were not related to the conduct of the business that they were then engaged in but were preparatory".). If the Wolfgrams intended to sell the house, the construction and sale of a single bed-and-breakfast inn did not constitute continuous and regular activity; it was a

"one-time job". Batok v. Commissioner, T.C. Memo. 1992-727; see also Kling v. Commissioner, T.C. Memo. 2001-78 (no trade or business found when taxpayer sold sports memorabilia only sporadically). The Wolfgrams have not started building any other structures in the substantial time that has elapsed since the completion of the one at issue here, although they claimed at trial that they were "in the process of * * * examining other lands that can be built on or rebuilt." They did not provide evidence that they ever attempted to sell the new house to a bed-and-breakfast operator. Thus, they were not carrying on a trade or business during the years at issue because they did not show they were engaged in an activity with regularity and continuity. See Sloan v. Commissioner, T.C. Memo. 1988-294, affd. without published opinion 896 F.2d 547 (4th Cir. 1990).

Under Commissioner v. Groetzinger, supra at 35, "the taxpayer's primary purpose for engaging in the activity must be for income or profit." The taxpayer must have "entered into the activity, or continued the activity, with the actual and honest objective of making a profit." Dreicer v. Commissioner, 78 T.C. 642, 644-645 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs. And the taxpayer must prove that profit was the dominant or primary objective of his or her venture. Mattfeld v. Commissioner, 73 15 73 AFTR 2d 94-1167 (9th Cir. 1994) (citing Polakof v.

Commissioner, 820 F.2d 321, 323 n.2 (9th Cir. 1987), affg. T.C. Memo. 1985-197), affg. T.C. Memo. 1992-273. Wolfgram did not prove that earning a profit was the primary purpose of building the house. The testimony is equivocal as to the exact purpose of the venture--operating a bed-and-breakfast inn or selling a bed-and-breakfast inn. As Wolfgram has the burden of proof, we conclude that she intended to operate the inn, not to sell it. We do not know how much of the inn was to be allocated to rent-paying tenants. Therefore, we cannot say that Wolfgram's primary motive in operating the inn was to turn a profit, as opposed to providing an abode for herself and her husband. See Rule 142(a); Welch v. Helvering, 290 U.S. at 115.

Even if the Wolfgrams were carrying on a trade or business, the amounts incurred to construct the house would not be fully deductible in the year they were incurred. Section 263 requires capitalization of "Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate." Sec. 263(a)(1). The regulations list examples of capital expenditures, one of which is the "cost of acquisition, construction, or erection of buildings". Sec. 1.263(a)-2(a), Income Tax Regs. The statute thus prohibits full

deductions of construction costs for the same tax year as the year in which they were incurred.[6]

## 2. Additional Reasons, Primarily the Lack of Substantiation, That Wolfgram Is Not Entitled to the Schedule C Deductions (Line-by-Line Analysis)

Having rejected the Schedule C deductions generally for the reasons described in part II.A.1, we now examine why each line item on the Schedule C should be disallowed. A common theme in this line-by-line discussion is Wolfgram's failure to meet her burden of proving that she is entitled to her deductions. In particular, she had to prove she incurred the amounts that support her claims for the deductions. See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992) (citing Interstate Transit Lines v. Commissioner, 319 U.S. 590, 593 (1943)). A taxpayer must maintain records relating to their expenses and must prove his or her entitlement to all claimed deductions, credits, and expenses in controversy; the taxpayer's burden thus includes the burden of substantiation. See sec. 6001; Rule 142(a); Hradesky v. Commissioner, 65 T.C. 87, 89-90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976); sec. 1.6001-1(a), Income Tax Regs.[7]

---

[6]Although an amount that is required to be capitalized under sec. 263 can be partially deducted under sec. 167 as depreciation, Wolfgram has not demonstrated that she is entitled to a depreciation deduction.

[7]Sec. 1.6001-1(a), Income Tax Regs., provides:

any person subject to tax * * * [under the Code] shall
(continued...)

The Code and the regulations do not expressly say what the remedy is if the taxpayer has no records proving the exact amount of an expense. The caselaw provides guidance. If a taxpayer establishes that he or she paid or incurred a deductible expense but does not establish the amount of the expense, under Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930), a court may approximate the amount of the allowable deduction, "bearing heavily if * * * [the court] chooses against the taxpayer whose inexactitude is of his [or her] own making." For the rule in Cohan to apply, there must be sufficient evidence in the trial record to provide a rational basis for the estimate; otherwise, the claimed deduction must be disallowed. Polyak v. Commissioner, 94 T.C. 337, 345 (1990); Vanicek v. Commissioner, 85 T.C. 731, 743 (1985); Profl. Servs. v. Commissioner, 79 T.C. 888, 919-920 (1982); Luman v. Commissioner, 79 T.C. 846, 859 (1982); Epp v. Commissioner, 78 T.C. 801, 807 (1982). We discuss whether Wolfgram has met her burden of proving that the couple incurred each expense deducted on the bed-and-breakfast Schedule Cs for 2004 and 2005 in parts a through i below.

---

[7](...continued)
keep such permanent books of account or records, including inventories, as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person in any return of such tax or information.

### a. Amounts Deducted as "Car and Truck" Expenses

On the joint returns that the Wolfgrams filed several years later, they claimed that in May 2004 they began using a vehicle for a combination of "business" and "other" uses and that in 2005 they used the same vehicle for a combination of "business" and "other" uses. It is unclear whether the vehicle described on the return was Wolfgram's car, which she drove from the mobile home to her place of employment and back, or whether the vehicle is the truck used by Wolfgram's husband, which he used in part in the construction of the new house.

To the extent that Wolfgram seeks to deduct the expense of operating her car, the expense is not deductible. The regulations under section 262 state that "The taxpayer's costs of commuting to his place of business or employment are personal expenses and do not qualify as deductible expenses."[8] Sec. 1.262-1(b)(5), Income Tax Regs. Thus, the cost of Wolfgram's commute to and from her full-time job is not deductible.

But even if the deducted miles were for Wolfgram's husband's truck, the mileage expense would not be allowable. Section 274(d) disallows any deduction with respect to "listed property" unless the taxpayer adequately substantiates: (1) The amount of

---

[8]Sec. 262(a) provides that "Except as otherwise expressly provided * * *, no deduction shall be allowed for personal, living, or family expenses."

the expense, (2) the time and place of the travel or the use of the property, (3) the business purpose of the expense, and (4) the business relationship of the persons using the property.  A passenger vehicle and "any other property used as a means of transportation" are "listed property".  Sec. 280F(d)(4)(A)(i) and (ii).  Testimony alone, without corroborative evidence, does not satisfy the requirements of section 274(d), and thus the <u>Cohan</u> rule is inapplicable.  Sec. 274(d); <u>United Title Ins. Co. v. Commissioner</u>, T.C. Memo. 1988-38.  Wolfgram's husband's testimony that he used the truck in the construction effort is not sufficient on its own to satisfy the strict substantiation requirement without a travel log.  Furthermore, even if some of the miles driven in the truck were related to the house, we have found that the construction of the house does not constitute a business under section 162(a) and that a profit motive was not the dominant purpose of the venture.

### b. <u>Amounts Deducted for Contract Labor Expenses</u>

Wolfgram deducted $2,600 in 2004 and $2,500 in 2005 for "Contract labor".  Wolfgram's husband testified that the $2,600 was the payment he made to an architect in 2004 to design the new house.  He did not substantiate the 2005 deduction through testimony or documentation.  He offered to get his laptop computer from his car during the Court's recess to find data regarding the contract labor expenditures.  He did not do so.

The deduction for contract labor is not allowable for at least two reasons. First, we find that the Wolfgrams did not expend any money for "contract labor" in 2005, on account of the void in the trial record regarding the expense for this year. Second, even to the extent that the Wolfgrams spent the money to construct the new house, this activity does not qualify as the "carrying on" of a business under section 162(a).

### c. Amounts Deducted as Insurance

Wolfgram deducted $600 for insurance for both tax years at issue. The record does not show that the $600 was paid for insurance. Thus, the amount is not deductible because Wolfgram has the burden of proof. Even if the amount was a cost of constructing the new house, this construction does not qualify as a "business" activity for purposes of section 162(a).

### d. Amounts Deducted as Interest

Wolfgram deducted $400 for interest for 2004. The record lacks any proof of what this $400 entry represented. The amount is therefore not deductible because Wolfgram has the burden of proving she is entitled to the deduction. See INDOPCO, Inc. v. Commissioner, 503 U.S. at 84. Even if the amount financed the new house, the Wolfgrams were not engaged in a trade or business under section 162(a).

e.  Amount Deducted as Office Expense

The Wolfgrams' 2005 joint income tax return deducted $200 as "Office expense".  The record does not show what this amount corresponds to.  The amount is therefore not deductible because none of the requirements for deduction were proven.  And even if the amount related to the new house, the activity is not a "business" activity for purposes of section 162(a).

f.  Amounts Deducted for Mobile Home Rent

The Wolfgrams deducted $3,420 in each year as a rental expense.  This amount corresponded to the yearly rent for the mobile home.  The amount is not deductible for either year. First, the Wolfgrams cannot deduct a portion of the mobile home rent because the Wolfgrams were not engaged in a trade or business.  See sec. 280A(c)(1)(A).[9]  Second, even if this

---

[9]Sec. 280A provides, in relevant part:

SEC. 280A(a). (a)  General Rule.--Except as otherwise provided in this section, in the case of a taxpayer who is an individual or an S corporation, no deduction otherwise allowable under this chapter shall be allowed with respect to the use of a dwelling unit which is used by the taxpayer during the taxable year as a residence.

*     *     *     *     *     *     *

(c)  Exceptions for Certain Business or Rental Use; Limitation on Deductions for Such Use.--

(1) Certain business use.--Subsection(a) shall not apply to any item to the extent such item is allocable to a portion of the dwelling unit

(continued...)

requirement was satisfied, Wolfgram has not demonstrated that a portion of the mobile home was used <u>exclusively</u> for her alleged business. See sec. 280A(c)(1).

g. <u>Other Amounts Deducted as Rent</u>

The Wolfgrams deducted $880 and $1,320 for the expense of renting "Other business property" in 2004 and 2005, respectively.[10] This amount is not deductible because (1) the record does not show what this amount is for, and (2) the Wolfgrams were not carrying on a business.

h. <u>Amounts Deducted for Repairing the Mobile Home</u>

The Wolfgrams deducted $300 in 2004 for repair of the mobile home. The amount is not deductible for the same reasons that the rental expense of the mobile home is not deductible; i.e., no

---

[9](...continued)
which is exclusively used on a regular basis--

(A) as the principal place of business for any trade or business of the taxpayer,

(B) as a place of business which is used by patients, clients, or customers in meeting or dealing with the taxpayer in the normal course of his trade or business; or

(C) in the case of a separate structure which is not attached to the dwelling unit, in connection with the taxpayer's trade or business.

[10]Schedule C contains a line item for reporting the expense of renting or leasing "Other business property" (i.e., business property other than vehicles, machinery, and equipment).

regular conduct of a business and no exclusive use of the property.  See sec. 280A(c)(1).

### i.    Amounts Deducted for Utilities

The Wolfgrams deducted $600 and $1,000 for utilities in 2004 and 2005, respectively.  Wolfgram's husband testified at trial that the utility expenses were payments for the electricity that was used to construct the new house.  He acknowledged that the couple did not maintain separate accounts with their electric utility provider for service to the mobile home and the new house.

The utility expenses are not deductible.  First, we have no way of estimating the amounts of the expenses attributable to the mobile home because the Wolfgrams did not maintain separate accounts and because they provided us with no documents.  The testimony of Wolfgram's husband was too vague for us to believe that the entire amount for each year was attributable to the mobile home.  Even if we could make an estimate, the amounts attributable to the mobile home are not deductible for the same reasons that the rental expense of the mobile home is not deductible; i.e., no conduct of a business and no exclusive use. See sec. 280A(c)(1).  Second, any amounts attributable to construction are not deductible because the Wolfgrams were not carrying on a business during the tax years at issue.

B.    Various Exemptions and Credits

Wolfgram claimed dependency exemptions for two sons on the 2004 joint return and for one son on the 2005 joint return. Section 151(c) (as in effect during the tax years at issue) permits an exemption for each of a taxpayer's children who is younger than 19, or younger than 24 if a student.  The Wolfgrams did not testify how old their children were, where they lived, who supported them, or even if they had children at all.  Under these circumstances, Wolfgram is not entitled to any dependency exemptions.[11]

Wolfgram also claimed a $680 Lifetime Learning Credit for 2004 and a $828 Hope Scholarship Credit for 2005 on behalf of one of her sons.  See sec. 25A.  Wolfgram did not submit any documents to this Court that substantiate the claims for these educational credits, nor did either of the Wolfgrams provide any testimony on the issue.[12]  Although Cohan allows us to estimate the amounts of deductions if the taxpayer proves that some deductible expenses were incurred and if there is a reasonable basis for estimating the amounts, these two conditions are not satisfied here.

_____

[11]Wolfgram did not discuss the exemptions in her opening or reply briefs; the IRS noted Wolfgram's lack of proof in its answering brief.

[12]They also failed to discuss it in both their opening and reply briefs; the IRS mentioned the issue in its answering brief.

III. <u>Additions to Tax</u>

The IRS bears the burden of production with respect to the additions to tax determined under sections 6651(a)(1) and 6654. Sec. 7491(c). Thus, once the taxpayer files a petition alleging an error in the determination of an addition to tax or penalty, the taxpayer's challenge will succeed unless the IRS produces evidence that the addition to tax or penalty is appropriate. <u>Swain v. Commissioner</u>, 118 T.C. 358, 364-365 (2002). Once the IRS has produced the evidence demonstrating that the addition to tax or penalty is appropriate, the taxpayer must provide the Court with sufficient evidence that the IRS's determination is incorrect. <u>Higbee v. Commissioner</u>, 116 T.C. 438, 447 (2001). The IRS's burden of producing evidence to show that the imposition of the penalty is appropriate does not require the IRS to defeat various defenses that the taxpayer can assert in response to penalties, such as the possibility that the taxpayer had reasonable cause for engaging in the conduct. <u>Id.</u> at 446.

A. <u>Section 6651(a)(1) Failure-To-File Addition to Tax</u>

The IRS determined that Wolfgram was liable for the section 6651(a)(1) late-filing addition to tax for the tax years 2004 and 2005. Section 6651(a)(1) imposes an addition to tax for failing to file a return by the filing deadline (determined by taking into account any extensions), unless such failure is due to reasonable cause and not due to willful neglect. The late-filing

addition to tax is 5 percent of the net amount of tax due on the date prescribed for payment for each month such failure continues, for up to 5 months.  Sec. 6651(a)(1, (b)(1).

Wolfgram stipulated that she and her husband submitted joint returns for 2004 and 2005 that the IRS received in early 2008, several years after the returns were due.  The stipulation satisfies the IRS's burden of producing evidence that the late-filing addition to tax should be imposed for each of the tax years at issue.

Section 6651(a)(1) provides that the late-filing addition to tax shall not be imposed if "it is shown that such failure [to file] is due to reasonable cause and not due to willful neglect".  Reasonable cause is demonstrated if the taxpayer "exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time".  Sec. 301.6651-1(c)(1), Proced. & Admin. Regs.  Willful neglect involves a "conscious, intentional failure or reckless indifference." United States v. Boyle, 469 U.S. 241, 245 (1985).  Wolfgram claims in her brief that she had reasonable cause for her failure to file timely returns because her husband threatened to leave her and this would cause her financial injury.  She also claimed that her husband promised to file a return but told her they did not need to do so because "there was no tax due and no penalty for failure to file where no tax was due."

Wolfgram has not cited any case that has considered whether spousal threats can constitute reasonable cause for failing to file a return. Even if we were to accept that Wolfgram's husband threatened to leave her, she did not prove her contention that the threat was financially significant. As far as we know, Wolfgram's husband did not earn any money during the years at issue. Wolfgram submitted no evidence that he owned any substantial assets. Therefore, we do not know why her husband's threat was significant enough to bend Wolfgram's will to her husband's directive that she not file a return. And without her testimony about the effect of his threat, we are unconvinced that she was unable to resist his demands.[13]

Wolfgram also claimed that she relied on her husband's assurances (1) that he would file a return, and (2) that the couple owed no tax anyway and would not be penalized. His first assurance does not constitute reasonable cause. Wolfgram had an obligation to monitor her husband's compliance with the filing deadline and ensure he followed through. See United States v. Boyle, supra at 252 ("The failure to make a timely filing of a tax return is not excused by the taxpayer's reliance on an agent, and such reliance is not 'reasonable cause' for a late filing").

---

[13]Indeed, because Wolfgram failed to testify that she could not resist her husband's demands, we infer that she was able to resist his demands. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

Wolfgram was not reasonable in relying on her husband's second assurance that the couple would not be penalized for failing to file.  Section 6012(a)(1)(A) generally requires a taxpayer to file a return if his or her gross income exceeds the applicable exemption amount.  Neither the Code nor the caselaw excepts from this filing requirement a taxpayer who has deductions or credits sufficient to eliminate the tax liability that would otherwise be due.  Thus, Wolfgram's husband's advice that the couple need not file a return was incorrect.  The regulations state that "Reliance on * * * professional advice * * * constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith."  Sec. 1.6664-4(b)(1), Income Tax Regs. Wolfgram did not consult a tax professional; thus, she cannot claim reliance on professional advice.  See Huang v. Commissioner, T.C. Memo. 1997-257 (taxpayers had no reasonable cause for avoiding negligence penalty when taxpayers failed to consult a tax professional to verify the disallowed claims made on their return).  We find that Wolfgram had no reasonable cause for failing to file her tax returns on time for the tax years 2004 and 2005.

B.  Section 6654(a) Failure-To-Pay-Estimated-Tax Addition to Tax

The IRS determined in its notices of deficiency that Wolfgram was liable for the section 6654(a) addition to tax for

failing to pay estimated income tax for the tax years 2004 and 2005.  It later conceded that she was not liable for the addition for 2004.  Wolfgram contends that no penalty should be imposed because she estimated that she owed no tax for 2005.  But the penalty calculations do not depend on what a taxpayer estimates the tax will be.  According to the Code, Wolfgram's "required annual payment" is 90 percent of her actual tax liability for 2005 if she did not file a return for either 2004 or 2005.  See sec. 6654(d)(1)(B).[14]  Wolfgram admits in her reply brief that she "filed no return" for 2005; she also did not file a return for 2004.[15]  Therefore, her "required annual payment" is equal to

---

[14]The "required annual payment" is equal to

the lesser of--

> (i) 90 percent of the tax shown on the return for the taxable year (or, if no return is filed, 90 percent of the tax for such year), or

> (ii) 100 percent of the tax shown on the return of the individual for the preceding taxable year.

Clause (ii) shall not apply if the preceding taxable year was not a taxable year of 12 months or if the individual did not file a return for such preceding taxable year.

Sec. 6654(d)(1)(B).

[15]Wolfgram did not file a return for either 2004 or 2005 until after the notices of deficiency for those years were issued.  A return filed after a notice of deficiency is issued is not a filed return for purposes of the test contained in sec. 6654(d)(1)(B)(i).  Mendes v. Commissioner, 121 T.C. 308, 325 (2003) ("the taxpayer would be able to negate the addition to tax
(continued...)

90 percent of her actual tax liability for 2005.[16]  Wolfgram did not make any part of the required annual payment on the dates required by the statute.  Consequently, the IRS has satisfied its burden of production under section 7491(c) for the section 6654(a) addition to tax.  See Wheeler v. Commissioner, 127 T.C. 200, 210-211 (2006), affd. 521 F.3d 1289 (10th Cir. 2008).

Wolfgram's claim that she should not be subject to the estimated-tax penalty because she estimated that she owed no tax for 2005 amounts to a reasonable cause defense--but there is no reasonable cause defense available for the penalty.  Only the exceptions set forth in section 6654(e) exonerate a taxpayer from the penalty.  Grosshandler v. Commissioner, 75 T.C. 1, 20-21 (1980); Estate of Ruben v. Commissioner, 33 T.C. 1071, 1072 (1960); sec. 1.6654-1(a)(1), Income Tax Regs.  None of the exceptions is applicable here.  Therefore, Wolfgram is liable for the section 6654(a) addition to tax for 2005.

---

[15](...continued)
simply by filing a return for that year that showed a tax liability less than the quarterly estimated payments actually made or, if none had been made, that showed a zero tax liability. Such a result is inconsistent with both the purpose and function of section 6654(d)(1)(B)(i)").  The same reasoning applies to the test contained in sec. 6654(d)(1)(B)(ii).

[16]We need not compare the sec. 6654(d)(1)(B)(i) amount to the sec. 6654(d)(1)(B)(ii) amount because Wolfgram did not file a return for 2004.  See sec. 6654(d)(1)(B); Wheeler v. Commissioner, 127 T.C. 200, 210-212 (2006), affd. 521 F.3d 1289 (10th Cir. 2008).  She did not file a return for 2005; thus, her required annual payment is 90 percent of her actual tax liability for 2005.

In reaching our holdings, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.